01

02

03

04

05                     UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF CALIFORNIA

06  BRADFORD DICKSON,                    )
                                         )
07          Petitioner,                  )    CASE NO. 2:07-cv-01232-JLR-JLW
                                         )
08          v.                           )
                                         )
09  R.J. SUBIA, Warden,                  )    REPORT AND RECOMMENDATION
                                         )
10          Respondent.                  )
    _____ )

11

12          I.      INTRODUCTION

13          Petitioner is currently incarcerated at the Mule Creek State Prison in Ione, California.

14  He seeks relief under 28 U.S.C. § 2254 from his 2004 jury conviction in the Solano County

15  Superior Court for fifteen sex offenses, including lewd and lascivious conduct on a child, oral

16  copulation on a child, and unlawful sexual intercourse with a child.  (*See* Docket 1; Dkt. 16, 1

17  Clerk's Transcript at 131-36 and 270-77.)  All of these charges involved his relationship with

18  "C.M.," his stepdaughter, when she was approximately thirteen through sixteen years of age.

19  Petitioner is currently serving a determinate sentence of eighteen years and four months in

20  prison.  (*See* Dkt. 16, 2 CT at 446-48.)  Respondent has filed an answer to the petition, along

21  with relevant portions of the state court record, and petitioner has filed a traverse in reply to

22  the answer.  (*See* Dkts. 16 and 19.)  The briefing is now complete and this matter is ripe for

REPORT AND RECOMMENDATION - 1

01  review.  The Court, having thoroughly reviewed the record and briefing of the parties,

02  recommends that the Court deny the petition and dismiss this action with prejudice.

03      II.   FACTUAL AND PROCEDURAL HISTORY

04         On direct review, the California Court of Appeal summarized the relevant facts

05  adduced during petitioner's trial as follows:

06       A. *Molestation*

> On October 16, 2002, 16-year-old C.M. appeared shaky and unfocused when she met with her friend Sarah to study after school.  C.M. confided in Sarah that she was upset because the man she regarded as her stepfather – appellant Bradford Neal Dickson – had been sexually molesting her since she was 13 years old.  That night, Sarah told her parents what C.M. had told her.  Sarah and her stepfather accompanied C.M. to report the molestation to the Vacaville Police Department the following day.
>
> While she was with the police, they recorded a telephone conversation that C.M. had with Dickson.  In that call, C.M. said that when she and Sarah had been "talking about relationships," she "slipped" and told her friend "about us."  Dickson responded: "What? What? [Your] mom's here, I gotta be careful."  C.M. told him that she was alone – that no one was around just then.  When he asked how "much . . . detail[]" she gave, C.M. replied that she told Sarah "what kind of relationship we had."  Dickson asked what she meant by that, prompting C.M. to say that she told her friend that "we did it."  Dickson: "What in the hell are you talking about? Do you know what this causes now? . . . [Y]ou know what's going to happen? I probably won't even be here tomorrow. You just messed everything up for [your sister], for everything."  C.M. asked what would happen if Sarah told what she knew. Dickson replied, "A lot."
>
> In the telephone call, C.M. told Dickson that "I'm just thinking that . . . we shouldn't do it anymore . . . [b]ecause it makes me feel uncomfortable . . . and now [Sarah] knows. . . ."  Her stepfather responded by accusing C.M. of breaking her word to him and advising her to tell Sarah that she exaggerated things because she was angry with him. C.M. said "I'm thinking it would be better if we just stop . . . having sex. . . ."  Later, she

REPORT AND RECOMMENDATION - 2

asked him, can "we just stop doing it . . . [b]ecause it's bugging me[?]" C.M. said that she had told Sarah that Dickson was "[like] a boyfriend" to her, prompting Dickson to respond that she could have said that without offering "other details." When C.M. explained that she had not revealed details such as "when we started doing it," Dickson's response suggested that C.M. should not have said anything at all about it.

During the call from C.M., Dickson made other responses that were consistent with the molestation charges. He never challenged her implicit or explicit statements about a sexual relationship between them. He reminded her of the negative consequences to both of them if word got out at school. More than once, he worried aloud about someone overhearing the telephone conversation. Several times, he told C.M. to come home so that they could talk there and "sort it out before something really bad happens." Again and again, Dickson pressured C.M. to "take back" her allegations. He suggested that she say that she had made a false accusation against him out of anger. His last words were to "make sure you un-do it . . . . I'm counting on you to do that."

Dickson was arrested and jailed for several days. Initially, C.M.'s mother Kelly B. did not believe that C.M. was truthful. Kelly wanted to keep her family together and could not accept the implications of molestation on her own relationship with Dickson. On October 18, 2002, she pressured C.M. to copy out a letter to police saying that her molestation report had been false. C.M. left a voicemail message for police about the letter. When the police and a social worker visited her at school on October 21, 2002, C.M. told them that Kelly had compelled her to write the letter.

B.  *Charges and Pretrial Matters*

On October 25, 2002, a felony complaint was filed charging Dickson with three counts of sexual acts with a minor . . . C.M. was interviewed again by police on October 28, 2002. By November 2002, he had been arrested and released on bail. In March 2003, an amended felony complaint was filed charging him with 52 specific sexual offenses. He waived a preliminary hearing on these charges. C.M. was interviewed by police a third time during this month.

In April 2003, Dickson was charged by information with 52 sexual offenses committed against minor C.M. The charges of lewd acts with a child, oral copulation and unlawful sexual

REPORT AND RECOMMENDATION - 3

01   intercourse were allegedly committed between August 1999 and
October 2002. . . . In October 2003, Dickson's first defense
02   counsel was replaced by the attorney who ultimately defended
him at trial.
03         In January 2004, the information was amended to charge
15 counts – two counts of lewd and lascivious conduct, seven
04   counts of oral copulation and six counts of unlawful sexual
intercourse. . . .
05
C. *Trial*
06
07         At trial, C.M. testified that Dickson – who was 20 years
older than her and whom she regarded as her stepfather – lived
in her home from the time she was seven years old.  As she got
08   older, C.M. began to play soccer and softball.  Dickson took her
to her games and sometimes coached her teams.  She was closer
09   to Dickson than she was to her natural father, Geoffrey M.
10         Starting  when  she  was  13  or  14  years  old,  she  and
Dickson started sleeping in the living room, while Kelly shared
her bedroom with C.M.'s youngest sister.  The living room was
11   the room that was furthest from the bedrooms in their house.
Kelly worked long hours, going to bed early and rising early
12   each day to prepare for work. Dickson and C.M. started
sleeping in the living room so they could rise early to go to
13   sporting events without disturbing Kelly.
         Dickson and Kelly rarely had sexual relations.  C.M.
14   told the jury that one day, Dickson stopped acting like a father
and  began  touching  her  breasts. At  first,  he  touched  C.M.
15   through her clothing; later, he touched her breasts beneath her
clothes.  Dickson bought her clothing and gifts and let her do
16   things that she wanted to do in exchange for sexual contact.
C.M. received more attention from him than her siblings did.
17         C.M. told the jury that the sexual contact ceased for a
while, but that when she was 14, Dickson resumed routinely
18   touching her breasts.  She began orally copulating him two or
three times a week.  By the time she was 15, she and Dickson
19   were having sexual intercourse several times a week.  He used
condoms.  She complained that she did not want to do this, but
20   she "had to." Dickson told her not to tell anyone about their
sexual encounters.  If she did, he told her, she would have to
21   live elsewhere and would have to go to school somewhere else.
Dickson repeatedly threatened to take her out of her school or
22   take away some of her clothing as a penalty for not engaging in
sexual relations with him.  Being able to continue at her school

REPORT AND RECOMMENDATION - 4

01 and have the support of her school friends was very important to
her. C.M. did not tell Kelly about these incidents. She did not
02 have a close relationship with her mother and Dickson tried to
prevent them from being alone together.

03      Dickson also discouraged her from having friends her
own age. At high school, C.M. had a boyfriend. She told the
04 jury that she did not have sexual intercourse with her boyfriend.
She did not tell him about the molestation until after she had
05 reported it to police.

06      Dickson told C.M. that he cared for her and that his
relationship with Kelly was failing. He said that he planned to
07 marry C.M. when she turned 18 and moved away from home.
They had sexual relations on the night before she told Sarah
08 about the molestation. Her first report to police was not
complete – it took a while for her to feel comfortable with the
09 male police officer to be completely candid with him. C.M. had
several police interviews, some of which were videotaped.

10      On October 22, 2002, Child Protective Services
removed C.M. from Kelly's home. C.M. moved to Folsom to
11 live with her father Geoffrey M. for her junior year in high
school. She did not want to do so – she wanted to stay in her
12 school where her boyfriend and her other friends were going to
school. Soon, her younger sister was removed from Kelly's
13 home and joined C.M. at their father Geoffrey's house. Kelly
and Geoffrey became involved in a dispute about which parent
14 should have custody of their daughters. Over time, Kelly came
to accept that C.M.'s report of molestation had been true.
15 Before the school year began in the fall of 2003, C.M. was
allowed to return to her mother's home.

16      Dickson's defense attorney cross-examined C.M.,
attempting to undermine her credibility. He brought out the fact
17 that she occasionally stayed alone overnight at a hotel with
Dickson when traveling to participate in soccer and softball
18 tournaments. C.M. denied that any sexual contact occurred
during these overnight hotel stays. Dickson wanted to have
19 sexual intercourse during these overnight hotel stays, but she
complained that she had to get up early to play sports and he
understood this.

20      Defense counsel also elicited evidence that C.M. was
taking birth control pills. She explained that Dickson did not
21 obtain these for her – she got them from a friend. She told the
jury that she feared becoming pregnant. She took several home
22 pregnancy tests during this time, apparently at Dickson's
request.

01          Also on cross-examination, Dickson's defense attorney
02   noted that C.M. told the jury that the first incident of
     molestation had occurred in the summer.   C.M. had also
     testified that she received a gift that she wanted for Christmas in
03   exchange for the sexual contact.   Defense counsel suggested
     that the lapse of time between summer and Christmas made this
04   testimony suspect.   Defense counsel also noted various
     inconsistencies in C.M.'s reports to police.
05          Kelly and C.M.'s sister both testified about their home
     life with Dickson.  A social worker also testified about the
06   reactions that C.M. and Kelly had to the initial report of
     molestation.  The jury heard the tape recording of the telephone
07   conversation that C.M. had with Dickson on October 17, 2002.
     It also saw the October 18, 2002 letter that C.M. wrote to police
08   recanting her molestation charges.   Videotapes of three police
     interviews with C.M. were also played for the jury.   The jury
09   was given the means to review the audiotape and videotapes
     during deliberations.

10
     D.  *Verdict, Posttrial Motions and Sentencing*
11
            In February 2004, after deliberating for a day and a half,
12   the jurors advised the trial court that they were unable to reach a
     unanimous verdict.  After three ballots, the jury was divided 10
13   to 2.  The trial court ordered the jurors to continue deliberations.
     At the end of that afternoon's deliberations, the jurors had taken
14   a fourth ballot, but were still divided.   Some of the jurors
     believed that further deliberations might be productive, so the
15   trial court ordered the jurors to return the following day to
     resume deliberations.
16          On the following day, the jury unanimously convicted
     Dickson of all 15 counts.  In April 2004 before sentencing, new
17   counsel was substituted for trial counsel.   In August 2004,
     sentencing counsel moved for a new trial, based in part on a
18   claim of ineffective assistance of counsel at trial. . . .  After
     hearing, the trial court – noting that it found C.M. to be a
19   credible witness – denied the motion.  Dickson was sentenced to
     18 years, four months in state prison. . . .

20

21   (Dkt. 16, Exhibit J at 1-7.)

22


REPORT AND RECOMMENDATION - 6

01          The California Court of Appeal affirmed petitioner's judgment on July 28, 2005, and

02    the California Supreme Court denied review on October 26, 2005.  (*See id*. at 22; *id*., Ex. K.)

03    Petitioner filed a petition for writ of habeas corpus in the California Supreme Court on

04    January 22, 2007.  (*See id*., Ex. L.)  After the state court summarily denied his petition,

05    petitioner timely filed the instant federal habeas petition on June 22, 2007.  (*See* Dkt. 1).

06          III.     FEDERAL CLAIMS FOR RELIEF

07          Petitioner presents the following claims for relief in his federal habeas petition:

08          (A)     Petitioner's right to effective assistance of counsel was violated by his trial
                    counsel's failure to:

09

10                 (1)     Call any witnesses;

11                 (2)     Present any physical evidence, including (a) handwritten notes by C.M.
                           and C.M.'s friends, (b) a progress report and an email from C.M.'s
                           science teacher, and (c) an audiotape of law enforcement's second
12                         interview of C.M.;

13                 (3)     Introduce evidence of C.M.'s false allegations against her biological
                           father;
14

15                 (4)     Explain to the jury petitioner's statements during the pretext phone call;

16                 (5)     Cross-examine C.M. adequately;

17                 (6)     Allow petitioner to testify in his own defense;

18                 (7)     Present expert testimony regarding petitioner's genital herpes; and

19                 (8)     Allow petitioner's private investigator to be present at trial.

          (B)     Petitioner's confrontation and due process rights were violated by law
20                enforcement's "suggestive questioning" of C.M. during pretrial interviews, and
                  his counsel was ineffective for failing to introduce an email from C.M.
21                admitting this fact at trial;

22          (C)     Petitioner's right to due process and effective assistance of trial counsel were
                    violated by prosecutorial misconduct during closing argument;

REPORT AND RECOMMENDATION - 7

01      (D)    Petitioner's right to due process was violated by jury misconduct during
deliberations; and

02

03      (E)    Petitioner's right to due process was violated by cumulative prejudice
stemming from the above alleged errors.

04  (*See* Dkt. 1 at 1-26.)

05      Respondent concedes that petitioner has exhausted all his claims for relief, but

06  contends that his claims are without merit.  (*See* Dkt. 16 at 2-3.)

07      IV.     STANDARD OF REVIEW

08      The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

09  petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

10  320, 326-27 (1997).  Because petitioner is in custody of the California Department of

11  Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

12  vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

13  (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

14  custody pursuant to a state court judgment. . . .").  Under AEDPA, a habeas petition may not

15  be granted with respect to any claim adjudicated on the merits in state court unless petitioner

16  demonstrates that the highest state court decision rejecting his petition was either "contrary to,

17  or involved an unreasonable application of, clearly established Federal law" as determined by

18  the U.S. Supreme Court, or "was based on an unreasonable determination of the facts in light

19  of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2).

20      As a threshold matter, this Court must ascertain whether relevant federal law was

21  "clearly established" at the time of the state court's decision.  To make this determination, the

22  Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

01    *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit precedent

02    remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

03     331 F.3d 1062, 1069 (9th Cir. 2003).

04          The Court must then determine whether the state court's decision was "contrary to, or

05    involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

06    *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

07    grant the writ if the state court arrives at a conclusion opposite to that reached by [the

08    Supreme] Court on a question of law or if the state court decides a case differently than [the]

09    Court has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 412-13.

10    "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

11    state court identifies the correct governing legal principle from [the] Court's decisions but

12    unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  At all

13    times, a federal habeas court must keep in mind that it "may not issue the writ simply because

14    [it] concludes in its independent judgment that the relevant state-court decision applied clearly

15    established federal law erroneously or incorrectly.  Rather that application must also be

16    [objectively] unreasonable."  *Id.* at 411.

17          In each case, the petitioner has the burden of establishing that the state court decision

18    was contrary to, or involved an unreasonable application of, clearly established federal law.

19    *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

20    whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

21    state court decision because subsequent unexplained orders upholding that judgment are

22    presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

REPORT AND RECOMMENDATION - 9

01   (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).

02         When a state court reaches a decision on the merits but provides no reasoning to

03   support its conclusion, we must independently review the record to determine whether the

04   state court erred in its application of U.S. Supreme Court law.  *Delgado v. Lewis*, 223 F.3d

05   976, 982 (9th Cir. 2000).  *See also Greene v. Lambert,* 288 F.3d 1081, 1089 (9th Cir. 2002)

06   (holding that when there is an adjudication on the merits but no reason for the decision, the

07   court must review the complete record to determine whether resolution of the case constitutes

08   an unreasonable application of clearly established federal law).  Thus, while our review of the

09   record will be conducted independently in this case with regard to several of petitioner's

10   claims, we continue to show deference to the state courts' ultimate decision.  *See Pirtle v.*

11   *Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

12         Finally, AEDPA requires federal courts to give considerable deference to state court

13   decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

14   Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

15   *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

16   (9th Cir. 1993)).

17         V.      DISCUSSION

18         A.      *Petitioner's Ineffective Assistance of Counsel Claims*

19         1.      Trial Counsel's Failure to Call Any Witnesses

20         Petitioner contends that his right to effective assistance under the Sixth and Fourteenth

21   Amendments was violated by numerous errors by his trial counsel, which prejudiced the

22   outcome of his trial.  (*See* Dkt. 1 at 1.)  First, petitioner contends that his trial counsel's

01  performance was deficient because he failed to call any defense witnesses. (*See id*. at 2.)  He

02  asserts that the private investigator assigned to his case, Eugene Borghello, interviewed

03  "[s]everal witnesses . . . [who] offered vital information regarding [C.M.'s] anger and

04  defiance towards typical parental direction" and who should have been called by his counsel

05  to testify. (*Id*.)  Specifically, petitioner claims his counsel should have called Rich Woods,

06  the high school football coach at C.M.'s school, and Michelle Albrecht, one of petitioner's

07  coworkers. (*See id*.; Dkt. 16, 1 CT at 80.)  Petitioner argues that Woods would have testified

08  "regarding the environment and influence of [C.M.'s] best friend, Heather Barksdale," who

09  had "previously and wrongly accused [Woods] of abuse towards his own son." (Dkt. 1 at 2.)

10  Petitioner contends that C.M. was "a supporter present at the creation of the scheme against

11  Mr. Woods [by Barksdale] mere months before [C.M.'s] allegations were made against

12  petitioner. (*Id*.; Dkt. 16, 1 CT at 82.)  Petitioner also argues that Albrecht could have

13  "verified the influence of [Barksdale] over [C.M.], as well as the wayward actions of [C.M.]

14  herself with her truancy, inappropriate actions with her boyfriend, dishonesty regarding who

15  she was with, her whereabouts, and the overall disregard for any parental boundaries." (Dkt.

16  1 at 2.)

17          The Sixth Amendment guarantees a criminal defendant the right to effective assistance

18  of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Claims of ineffective

19  assistance of counsel are evaluated under the two-prong test set forth in *Strickland*.  In order

20  to prevail, a defendant must prove (1) that counsel's performance fell below an objective

21  standard of reasonableness, and (2) that the deficient performance prejudiced the result of the

22  proceeding.  *Id*. at 687-88 and 691-92.  In all cases, there is a strong presumption that

01  counsel's performance fell within the wide range of reasonably effective assistance. *Id*. at

02  689.  To demonstrate prejudice, the petitioner "must show that there is a reasonable

03  probability that, but for counsel's unprofessional errors, the result of the proceeding would

04  have been different." *Id*. at 694.  The U.S. Supreme Court defines "reasonable probability" as

05  a "probability sufficient to undermine confidence in the outcome." *Id*.  The reviewing Court

06  need not address both components of the inquiry if an insufficient showing is made on one

07  component, and there is no prescribed order in which to address them. *Id.* at 697.

08          In addition, to establish ineffective assistance of counsel based upon a failure to call

09  witnesses, the petitioner must identify the witnesses in question, state with specificity what

10  those witnesses would have testified to, and explain how that testimony might have altered the

11  outcome of the trial.  *See Alcala v. Woodford*, 334 F.3d 862, 872-73 (9th Cir. 2003); *see also*

12  *United States v. Berry*, 814 F.2d 1406, 1409 (9th Cir. 1987) (rejecting appellant's ineffective

13  assistance claim where "[h]e offer[ed] no indication of what these witnesses would have

14  testified to, or how their testimony might have changed the outcome of the hearing.").

15  Finally, the petitioner must show that the witnesses in question were actually available and

16  willing to testify.  *See Alcala*, 334 F.3d at 872-73.  *See also United States v. Harden*, 846 F.2d

17  1229, 1231-32 (9th Cir. 1988) (rejecting ineffective assistance claim where there was no

18  evidence which established that the witness would have testified in the trial).

19          Petitioner first presented this claim in his habeas petition to the California Supreme

20  Court, which was summarily denied.  (*See* Dkt. 16, Ex. L at 1-2.)  Thus, this Court must

21  independently review the record to determine whether the denial of petitioner's claim was an

22  unreasonable application of *Strickland*.  *See Delgado*, 223 F.3d at 982; *Strickland*, 466 U.S. at

01  691-92.

02         After thoroughly reviewing the record, this Court finds that trial counsel's failure to

03  call Woods to testify was objectively reasonable under the circumstances.  Petitioner fails to

04  provide any evidence to support his assertions, such as a declaration from Woods

05  summarizing his proffered testimony and indicating that he was available and willing to

06  testify at petitioner's trial.  *See Alcala*, 334 F.3d at 872-73; *Berry*, 814 F.2d at 1409.

07  Although petitioner provided a declaration from his private investigator, the investigator only

08  claimed to have "developed information indicating that the football coach at the high school

09  the victim attended was aware of possible problems with the victim's credibility."  (Dkt. 1,

10  Ex. 1 at 2.)  Without more, trial counsel could have reasonably concluded that a high school

11  football coach's testimony regarding "the environment and influence" between two female

12  students would have likely been excluded by the trial court.  *See* Cal. Evid. Code § 352 (trial

13  court may exclude evidence if its probative value is substantially outweighed by the

14  probability that its admission will necessitate undue consumption of time, or create danger of

15  undue prejudice, confusing the issues, or misleading the jury).

16         Petitioner also fails to provide a declaration from Albrecht summarizing her proffered

17  testimony and indicating that she was available and willing to testify at petitioner's trial.  *See*

18  *Alcala*, 334 F.3d at 872-73; *Berry*, 814 F.2d at 1409.  Based upon an interview of Albrecht

19  conducted by petitioner's private investigator, trial counsel could have reasonably concluded

20  that Albrecht's testimony consisted of inadmissible hearsay because she had no first-hand

21  knowledge of C.M.'s activities or relationships, as petitioner claims.  (*See* Dkt. 16, 1 CT at

22  80-83.)  Although petitioner's private investigator claimed that Albrecht "could testify about

01  the victim's lack of credibility and the fact that she was upset and angry with the defendant

02  about unrelated matters prior to making the allegations," Albrecht was only "acquainted

03  somewhat" with C.M.  (*See id*. at 81 and 83; Dkt. 1, Ex. 1 at 1-2.)  Albrecht's daughter

04  attended C.M.'s school, and she worked with petitioner, who "would come to her daily and

05  tell her things about [C.M.]."  (*See* Dkt. 16, 1 CT at 80.)  Albrecht's most recent first-hand

06  observations of C.M. seem to have taken place at a few football games, where she glimpsed

07  C.M. with her boyfriend from afar.  (*See id*. at 81.)

08          Finally, even if Albrecht's testimony was admissible, it had limited impeachment

09  value.  C.M. admitted arguing frequently with petitioner around the time that she first

10  disclosed the molestation, and dating her boyfriend without petitioner's knowledge.  (*See* Dkt.

11  16, 1 Reporter's Transcript at 145.)  Albrecht's testimony may have even harmed petitioner's

12  case, because the jury could have found Albrecht's description of petitioner's preoccupation

13  with C.M.'s love life and extracurricular activities consistent with the prosecution's portrayal.

14  (*See id*., 2 RT 306-07; *id*., 1 CT at 80-83.)   Under these circumstances, it was objectively

15  reasonable for trial counsel to decline to offer Albrecht's testimony at trial.

16          Based upon the foregoing, as well as the substantial evidence of petitioner's guilt

17  presented at trial, there is no reasonable probability that the result of the trial would have been

18  different if Woods or Albrecht had testified.  *See Strickland*, 466 U.S. at 691-92.  Petitioner

19  has failed to show that the California Supreme Court's denial of petitioner's ineffective

20  assistance of counsel claim was an unreasonable application of *Strickland*.  I therefore

21  recommend that the Court deny petitioner's claim.

22

REPORT AND RECOMMENDATION - 14

01          2.      Trial Counsel's Failure to Present Any Physical Evidence

02          Petitioner contends that his trial counsel was ineffective because he failed to introduce

03   any physical evidence, including four handwritten notes by C.M. and several of her friends, a

04   progress report and email regarding C.M.'s performance in school, and an audiotape of an

05   additional interview of C.M. conducted by Detective Donaldson.  (*See* Dkt. 1 at 4-6.)

06   Petitioner first presented these contentions in his habeas petition to the California Supreme

07   Court, which was summarily denied.  (*See* Dkt. 16, Ex. L at 3-6.)  This Court must determine

08   whether the state court's denial was an unreasonable application of *Strickland.  See Delgado*,

09   223 F.3d at 982; *Strickland*, 466 U.S. at 691-92.

10          a.      *Handwritten Notes by C.M. and C.M.'s Friends*

11          Petitioner argues that his trial counsel should have introduced four "handwritten notes

12   by [C.M.] and her peers, which demonstrate her wayward behavior at the time, her contempt

13   for petitioner for trying to remedy her rebellious behavior, and her intent to continue such

14   behavior at any cost."  (Dkt. 1 at 4.)  He alleges that one of the notes, which was written by

15   C.M. to a friend, showed that C.M. would go to any length to maintain her forbidden

16   relationship with her boyfriend, including "concoct[ing] allegations that would remove

17   petitioner from his role as parent."  (*Id*.)  Specifically, C.M. wrote, "I told [my boyfriend] Kris

18   what my dad said.  I told him not to worry about it because I wasn't [worrying].  I just wanted

19   him to know that I love him with all of [my heart] and I would not let anything stand in the

20   way of our relationship."  (*Id*., Ex. 5.)

21          Contrary to petitioner's assertions, it was objectively reasonable for petitioner's trial

22   counsel to decline to introduce the four handwritten notes into evidence.  The notes were

REPORT AND RECOMMENDATION - 15

01  inadmissible hearsay, and petitioner has not alleged that any hearsay exception made them

02  admissible at trial.  (*See id*., Exs. 5 - 6B).  *See also* California Evidence Code § 1200 (hearsay

03  evidence is inadmissible, absent an applicable exception).  Three of the notes were written to

04  C.M. by students who were not called as witnesses at trial, and the note written by C.M. does

05  not appear to have been admissible to impeach C.M. as a prior inconsistent statement.  *See*

06  Cal. Evid. Code § 770 (extrinsic evidence of a witness' inconsistent statement is inadmissible

07  unless the witness was examined while testifying, giving the witness the opportunity to

08  explain or deny the statement).  At most, C.M.'s note demonstrated that she continued to date

09  her boyfriend against petitioner's wishes, which she admitted, "I honestly tried to hide it

10  [from petitioner], the fact that I was seeing Kris."  (Dkt. 16, 1 RT at 145; *see id*. at 81-82.)

11          Finally, the four notes did not discuss C.M.'s relationship with petitioner, C.M.'s

12  molestation allegations, or cast any doubt on the substantial evidence of petitioner's guilt

13  presented at trial, such as the pretext phone call.  (*See* Dkt. 1, Exs. 5 - 6B).  Thus, even if the

14  notes had been admitted, there is no reasonable probability that the result of the trial would

15  have been different.  *Strickland*, 466 U.S. at 694.  Petitioner's contention should be denied.

16          b.      *Progress Report and Email from C.M.'s Science Teacher*

17          Petitioner contends that his trial counsel should have introduced C.M.'s August 26,

18  2002, progress report, as well as an email from C.M.'s science teacher dated September 13,

19  2002, into evidence at trial.  Specifically, petitioner asserts that this evidence would have

20  impeached C.M.'s testimony that she "had gotten very good grades" in school until she

21  revealed the molestation, and contradicted the prosecutor's argument that C.M. maintained "a

22  3.5 grade point average while all of this was going on."  (Dkt. 1 at 5; Dkt. 16, 2 RT at 274 and

01   341.)  The progress report reflects grades ranging from A-F, and notes C.M.'s "poor

02   attendance" in science class.  (Dkt. 1, Ex. 3.)  The email from C.M.'s science teacher states

03   that C.M.'s recent "quiz grades were not good at all."  (*Id*., Ex. 4.)  Petitioner asserts that this

04   evidence supports his argument that C.M. fabricated her allegations in October 2002 in

05   retaliation for petitioner's efforts to discipline her for allowing her grades to decline and

06   skipping classes.  (*See id*. at 4-5.)

07          Contrary to petitioner's assertions, however, it was objectively reasonable for trial

08   counsel to decline to introduce the progress report or email at trial because this evidence had

09   limited value for rebutting the prosecution's characterization of C.M. as a "good student," or

10   impeaching C.M.'s testimony.  Without more, the email and progress report do not prove that

11   C.M. must have made up her allegations against petitioner in retaliation for his efforts to

12   discipline her.  (*See* Dkt. 1 at 4-5.)

13          C.M. testified that "before all this," she "had gotten very good grades.  The only class

14   that [she] wasn't so sharp in was math, and [she] usually would end up with a C+ or a B- in

15   that class." (Dkt. 16, 1 RT at 103.)  After she revealed the molestation, however, her grades

16   "dropped significantly" and she received grades of "C's and D's and even F's."  (*Id*.)  In light

17   of C.M.'s acknowledgement, evidence that C.M.'s grades had begun to decline approximately

18   one month earlier than C.M. remembered, in late August and September 2002, had limited

19   value for impeaching C.M.'s character for truthfulness.  This is especially true because C.M.

20   readily admitted having frequent arguments with petitioner around the time that she first

21   disclosed the history of molestation.  (*See id*. at 145.)  She stated, "Well, honestly, there was

22   always something wrong, and arguments [between us] happened frequently."  (*Id*.)

REPORT AND RECOMMENDATION - 17

01      Accordingly, trial counsel's failure to introduce the email and progress report did not

02   constitute deficient performance.  Even if petitioner's counsel had introduced this evidence, in

03   light of the substantial evidence of petitioner's guilt, there is no reasonable probability that

04   C.M.'s credibility would have been so severely undermined that the result of the proceeding

05   would not have been different.  *See Strickland*, 466 U.S. at 694.  Accordingly, I recommend

06   that the Court deny petitioner's claim.

07           c.      *Audiotape of Law Enforcement's Second Interview of C.M.*

08      Petitioner contends that his trial counsel was ineffective because he failed to introduce

09   an audiotape of an interview of C.M. conducted by Detective Donaldson "five days after the

10   first interview," which was not played for the jury at trial.  (Dkt. 1 at 5-6.)  Specifically,

11   petitioner asserts that during this interview, rather than representing petitioner as

12   "controlling," as C.M. did during her other interviews, C.M. stated that petitioner "liked my

13   boyfriends . . . He lets me do things . . . He just dropped me off at homecoming at 4:30 a.m."

14   (*Id*. at 6.)  Petitioner claims his counsel should have played this interview for the jury to prove

15   that C.M. "was being deceptive with police" during her other interviews.  (*Id*.)

16      At trial, three audiotaped interviews of C.M. were introduced into evidence and played

17   for the jury.  (*See* Dkt. 16, 1 RT at 153-55.)  These interviews were conducted by Detective

18   Donaldson on October 17, 2002, October 28, 2002, and March 6, 2003.  (*See id*., Exs. D-F.)

19   C.M. testified that her first interview was on October 17, 2002, but "at first I didn't come out

20   and say everything right away.  I was really scared.  Honestly, I was even scared for

21   [petitioner].  I didn't know what was going to happen to anybody, so I didn't come out and

22   disclose all the information."  (*Id*., 1 RT at 83 and 111-13.)  C.M. estimated that Detective

01  Donaldson interviewed her "like four times."  (*Id*. at 82-83.)

02      Petitioner fails to provide any evidence to support his assertions regarding the content

03  of this additional interview.  In the record before this Court, there is no evidence of an

04  interview conducted only five days after C.M.'s October 17 interview.  Respondent also "does

05  not possess any record of such additional interview(s)."  (Dkt. 16 at 17.)  Petitioner's

06  conclusory allegations, without more, are insufficient to support a claim for habeas relief.  *See*

07  *Jones v. Gomez*, 66 F.3d 199, 204-05 (9th Cir. 1995).

08      Moreover, even assuming *arguendo* that petitioner's assertions regarding the existence

09  and content of the additional interview are true, there is no reasonable probability that it

10  would have changed the outcome of the trial.  The inconsistencies in C.M.'s statements

11  alleged by petitioner do not concern critical evidence relating to the molestation charges, but

12  concern whether petitioner was as "controlling" of C.M. in everyday life as the prosecution

13  claimed.  Furthermore, as discussed above, C.M. admitted that during her first interview with

14  the detective, she was not forthcoming about the facts because she was scared about what

15  would happen to Brad and the rest of her family.  (*See* Dkt. 16, 1 RT at 83 and 111-13.)  This

16  may have been equally true during an interview conducted only a few days later. Accordingly,

17  the California Supreme Court's decision denying this claim was not contrary to or an

18  unreasonable application of *Strickland.*

19      3.    <u>Trial Counsel's Failure to Introduce Evidence of C.M.'s False Allegations</u>
           <u>Against Her Biological Father</u>

20

21      Petitioner argues that his trial counsel was ineffective because he failed to adequately

22  investigate an incident in which C.M. made a false allegation of indecent exposure against her

biological father three months after her accusations against petitioner, and that trial counsel

01 mistakenly withdrew a motion in limine to introduce evidence of this incident at trial to

02 impeach C.M.'s credibility.  (*See* Dkt. 1 at 6-7.)  Petitioner contends that his case was "clearly

03 prejudiced by a critical, pertinent issue developed and then rendered not presentable from an

04 error confirmed by counsel's own admission on the record."  (*Id*. at 7-8.)

05      Under *Strickland*, a trial counsel's duty is to conduct reasonable investigations or to

06 make a reasonable decision that a particular investigation is unnecessary.  *See Strickland*, 466

07 U.S. at 691 (trial counsel's performance is not deficient where the "defense, though

08 unsuccessful, was the result of reasonable professional judgment.").  *See also Riley v. Payne*,

09 352 F.3d 1313, 1318 (9th Cir. 2003); *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir.

10 1995).  In addition, trial counsel have "wide latitude" in making tactical decisions, especially

11 when counsel has based his conduct on strategic considerations, made an informed decision

12 based upon investigation, and the decision appears reasonable under the circumstances.  *See*

13 *Strickland*, 466 U.S. at 689; *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).

14      Applying *Strickland*, the California Court of Appeal rejected petitioner's contentions.

15 Specifically, the court reasoned as follows:

16      1. *Facts*

17        Next, Dickson argues that his trial attorney was
ineffective for failing to introduce evidence of C.M.'s prior
18 false allegations of sexual misconduct made against her father
Geoffrey M. In September 2003, Dickson's first defense
19 counsel moved for a hearing on the issue of whether it would be
permitted to introduce evidence at trial of a prior false
20 allegation of sexual abuse made by C.M. against Geoffrey. (See
Evid. Code § 782.)  The motion sought to provide C.M.'s prior
21 sexual knowledge and to challenge her credibility by proving
that she had made a false allegation of indecent exposure
22 against Geoffrey. At the time that the exposure incident
occurred, C.M.'s parents were involved in a custody battle.

Apparently, Kelly alleged that Geoffrey had exposed himself in C.M.'s view.  Through his counsel, Geoffrey argued that the incident was innocent – that C.M. saw him from behind as he got out of the shower, unaware that C.M. was in the next room with Kelly.  The family court documents supporting Dickson's motion to offer this evidence against C.M. at his trial offered no evidence that C.M. had made any allegations against Geoffrey.

In October 2003, Dickson's first defense counsel declared a conflict and a second private attorney was appointed to represent Dickson.  In January 2004 – before the case went to trial – Dickson's second attorney withdrew the September 2003 motion.  On the record, he stated his belief that the motion was not necessary and that he did not intend to pursue the same "avenue" that Dickson's prior counsel apparently contemplated when he filed the motion.  However, as trial began, Dickson's trial attorney stated that he still intended to cross-examine C.M. about false charges made against Geoffrey.  He explained that he believed that he had only withdrawn the part of the motion relating to evidence of C.M.'s prior sexual knowledge, not that part relating to a prior false allegation of sexual misconduct against Geoffrey.  The trial court reviewed the record of the motion hearing, found no support for trial counsel's claim of partial withdrawal, and made a preliminary ruling that Dickson would not be permitted to call Geoffrey as a witness to challenge C.M.'s credibility. It ordered transcripts of the motion hearing to be prepared for the following day and indicated that it might reconsider its ruling once it had the transcripts.

During trial, Dickson's defense attorney explained that he no longer sought to call Geoffrey as an impeachment witness on this issue.  Instead, he would ask that the court play three videotaped police interviews of C.M. to impeach her testimony.  The prosecution argued both that C.M. did not make the allegation and that the evidence was insufficient to support the allegation of a false claim of sexual misconduct.  For the second time, Dickson's defense counsel formally withdrew his request to call Geoffrey as a witness and stated on the record that he did so for tactical reasons unrelated to the testimony that C.M.'s father might offer about a prior false accusation. The videotapes that Dickson's counsel sought to admit into evidence were played for the jury.

In his closing argument, Dickson's defense counsel began by reminding the jury of the importance of the videotaped evidence and focused on inconsistencies in C.M.'s testimony and prior statements.  After conviction but before

sentencing, Dickson's third attorney moved for a new trial alleging inter alia that trial counsel was ineffective for failing to bring out evidence of C.M.'s prior false accusations against Geoffrey. The trial court denied the motion for new trial.

2. *Legal Discussion*

There are several flaws in [Dickson's] argument. First, there is no evidence that C.M. ever accused her father of anything inappropriate, other than the unsubstantiated statement of Dickson's first attorney. The evidence in the record on appeal is an accusation that Kelly appears to have made. The circumstances of the incident that Geoffrey tried to counter in his family court papers support the implication that Kelly and C.M. both observed the incident. Dickson has not offered any direct evidence of an accusation, such that we cannot determine whether C.M. made this accusation herself. . . .

Second, even if C.M. made the accusation, it is unclear whether the facts would support a finding that she made a false allegation of sexual abuse. The evidence is capable of two interpretations – that Geoffrey committed an intentional act of indecent exposure or that he accidentally came into C.M.'s line of sight while emerging from a shower. Based on the scant evidence before us, it appears that an incident occurred, but that its significance was disputed. Again, Dickson offers no evidence from which we may determine whether the allegation was true or false. He has not proven this necessary element of an ineffective assistance of counsel claim by a preponderance of evidence. . . .

Third, even if there was sufficient evidence that C.M. herself accused Geoffrey and that her accusation was false, Dickson has not established that a decision not to offer Geoffrey as a witness was not a proper tactical decision. Trial counsel stated on the record that there were tactical reasons for not calling Geoffrey as a witness. He also stated on the record that he had discussed this decision fully with Dickson. On appeal, Dickson offers no declaration – none based on his own personal knowledge, none from trial counsel – explaining what those reasons were, which might support his claim that trial counsel's tactics were invalid. We cannot evaluate alleged deficiencies in trial counsels' representation unless the appellant offers us more than speculation. (See, e.g., *People v. Cox*, *supra*, 53 Cal.3d at p. 662.) Dickson has not rebutted the presumption that – even after trial counsel's initial misstep in withdrawing the motion to

01         put on evidence of a prior allegation of sexual abuse – his trial tactics were sound when he later chose not to pursue putting Geoffrey's testimony before the jury on this issue. (See *Strickland v. Washington, supra,* 466 U.S. at p. 689.)

Dickson also challenges trial counsel for an apparent failure to investigate the case fully. . . . Although trial counsel was clearly mistaken when he initially withdrew the September 2003 motion without making it clear to the trial court that he intended to withdraw only part of it, the issue before us on appeal is whether his later, second decision not to pursue calling Geoffrey as a witness was based on sound tactics. . . . Dickson offers no declaration of his own or from trial counsel setting out the lack of sound reasoning supporting trial counsel's later decision not to call Geoffrey as a witness. . . . An appellant must establish as a demonstrable reality any professional lapse in the actual defense employed in order to prove an ineffective assistance of counsel claim. (Ibid.) Under these circumstances, Dickson has not rebutted the presumption that trial counsel conducted a proper investigation of the case before making the tactical decision not to call C.M.'s father as an impeachment witness. (See *Strickland v. Washington, supra,* 466 U.S. at p. 689.)

(Dkt. 16, Ex. J at 11-15.)

Based upon the record before this Court, the conclusion of the California Court of Appeal was not an unreasonable application of *Strickland*. Petitioner has not shown that the "very distinct tactical reasons not to call [Geoffrey M.] as a witness" asserted by his trial counsel were not based upon a reasonable investigation, and the result of his informed, professional judgment. (Dkt. 16, 1 RT at 156-57; *id.* 2 RT at 299-00.) *See Ratelle*, 21 F.3d at 1456; *Strickland*, 466 U.S. at 691. Thus, petitioner has not shown that his counsel's performance was deficient. Petitioner has also failed to show that any errors by his counsel, including his counsel's mistaken withdrawal of the motion in limine during the pretrial hearing, prejudiced the outcome of the proceeding. Accordingly, I recommend that the Court deny petitioner's claim.

REPORT AND RECOMMENDATION - 23

4.      Trial Counsel's Failure to Explain to the Jury the Meaning of Petitioner's Statements During the Pretext Phone Call

Petitioner argues that his defense counsel was ineffective because he failed to call petitioner to testify about the pretext phone call, or otherwise present to the jury petitioner's innocent explanation for his statements during the pretext phone call.  (*See* Dkt. 1 at 8.) Specifically, petitioner claims that C.M. had frequently threatened to make false allegations against petitioner, and therefore "a subsequent call from the accuser – the pretext call – saying she's 'told' someone, meant to petitioner that she had finally carried out her longstanding threat."  (*Id*. at 8-9.)  Petitioner claims that his failure to implicitly or explicitly deny C.M.'s statements regarding their sexual relationship during the call did not indicate guilt, because he and C.M. both knew her threats against him "were false and frequent."  (*Id*. at 9.)  Finally, petitioner contends that his statement, "your mom's here, gotta be careful," was only expressing concern that if C.M.'s mom learned of C.M.'s false accusations, she would use C.M.'s allegations as a weapon to obtain custody of petitioner's own daughter.  (*Id*. at 10.)

Petitioner first presented this claim in his habeas petition to the California Supreme Court, which was summarily denied.  (*See* Dkt. 16, Ex. L at 9-11.)  This Court must independently review the record to determine if the state court's denial was an unreasonable application of *Strickland.  See Delgado*, 223 F.3d at 982; *Strickland*, 466 U.S. at 691-92.

Based upon the record before this Court, defense counsel's decision not to call petitioner as a witness to explain the pretext call appears to have been a reasonable tactical decision under the circumstances.  *See Ratelle*, 21 F.3d at 1456; *Strickland*, 466 U.S. at 691. Counsel could have identified the substantial risk that the jury would not have found petitioner's explanation credible, especially if petitioner was cross-examined by the

01  prosecutor.  As the trial court commented when it denied petitioner's motion for a new trial,

02  based in part upon petitioner's claim that his counsel should have called him to testify,

03  petitioner's testimony was "less than impress[ive]." (Dkt. 16, Ex. C at 18-20 and 33.)  The

04  trial court also observed that petitioner's "big problem here was the evidence against him.

05  One of the biggest problems was clearly this tape [of the pretext phone call]. . . ." (*Id*. at 34.)

06       Moreover, contrary to petitioner's assertion, trial counsel did present to the jury during

07  closing argument petitioner's innocent explanation for his statements during the pretext phone

08  call.  Counsel stated that during the call, petitioner was trying to talk C.M. out of telling a lie

09  that he knew would have "explosive" consequences for his career and his life.  (*See id*., 2 RT

10  at 327-28.)  He asserted, "If you believe [C.M.] is lying and you listen to that tape, it takes on

11  a whole different light, and you have to put yourself in that position of being accused by

12  someone. . . . [C.M.] made up a story and then kept adding to it. . . ." (*Id*. at 330.)  He also

13  stated, "This is the end of [petitioner's] career, it's the end of his life, and he's been

14  threatened with this before.  If you listen to the tapes this wasn't the first time." (*Id*. at 328.)

15       Accordingly, petitioner has failed to show that his trial counsel's performance was

16  deficient because he failed to call petitioner to testify about the pretext phone call, or

17  otherwise present petitioner's explanation to the jury.  *See Strickland*, 466 U.S. at 691.  *See*

18  *also Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) ("[D]eference to counsel's tactical

19  decisions in [his] closing presentation is particularly important because of the broad range of

20  legitimate defense strategy at that stage.").  In light of the substantial evidence of petitioner's

21  guilt, petitioner has also failed to show that his counsel's performance prejudiced the outcome

22  of the proceeding.  I therefore recommend that the Court deny petitioner's claim.

01          5.      Trial Counsel's Failure to Adequately Cross-Examine C.M.

02          Petitioner contends that his trial counsel's cross-examination of C.M. was so deficient

03  that it constituted ineffective assistance.  (*See* Dkt. 1 at 11.)  Specifically, he alleges that his

04  trial counsel failed to point out to the jury "any of the numerous amounts of inconsistent

05  statements" made by C.M. during her interviews with law enforcement and trial testimony.

06  (*Id*. at 11-12.)  Finally, he argues that his counsel's reliance upon the videotapes of C.M.'s

07  interviews played for the jury did not constitute an effective cross-examination strategy,

08  because "no reasonable, competent attorney would allow any and all impeachment elements

09  to fall by the wayside simply hoping someone would notice."  (*Id*. at 14.)

10          As discussed above, "trial counsel's representation must be only objectively

11  reasonable, not flawless or to the highest degree of skill." *Dows v. Wood*, 211 F.3d 480, 487

12  (9th Cir. 2000) (citing *Strickland*, 466 U.S. at 688-89.)  "Moreover, counsel's tactical

13  decisions at trial, such as refraining from cross-examining a particular witness or from asking

14  a particular line of questions, are given great deference and must similarly meet only

15  objectively reasonable standards." *Id*.

16          Petitioner first presented his claim on direct appeal to the California Court of Appeal.

17  In rejecting petitioner's claim, the court reasoned as follows:

18                  Dickson first complains that his trial counsel was
            ineffective for failing to adequately cross-examine C.M. about
19          her prior inconsistent statements.  His motion for new trial
            grounded in the same complaint was denied. . . . He cites
20          videotaped statements that C.M. gave to police as evidence that
            these inconsistencies existed.  The jury saw these videotapes
21          and heard the direct evidence of C.M. making the prior
            inconsistent statements – evidence that is even stronger than a
22          later admission on the stand that a prior statement was
            inconsistent. Defense counsel emphasized her inconsistent

01  statements in closing argument.

02  Dickson appears to contend that it was insufficient to show the tapes without pointing out each inconsistency.  The manner of cross-examination of a witness is a matter falling

03  within trial counsel's discretion. . . . It rarely provides an adequate basis on appeal to support a claim of ineffective

04  assistance of counsel. . . . In this matter, when the videotapes showed C.M. making the prior inconsistent statements, we find

05  that trial counsel's failure to examine her closely on these statements was not ineffective assistance of counsel.

06

07  (Dkt. 16, Ex. J. at 10.)

08  Based upon the record before this Court, the California Court of Appeal's conclusion

09  was consistent with clearly established federal law.  Although petitioner's trial counsel may

10  not have cross-examined C.M. as vigorously as petitioner would have liked, defense counsel

11  did not simply play the videotapes of C.M.'s interviews without pointing out any

12  inconsistencies in C.M.'s testimony, as petitioner asserts.  Defense counsel's cross-

13  examination brought out several inconsistencies in C.M.'s testimony.  (*See* Dkt. 16, 1 RT at

14  137-145 and 147-152.)  During closing argument, defense counsel also emphasized several

15  inconsistencies between C.M.'s testimony and her law enforcement interviews, and argued

16  that the jury should not consider C.M. credible.  (*See id*., 2 RT at 330-36.)  He argued that

17  "one of the tests for determining whether someone is telling the truth is consistency.  I mean,

18  if something is true, no matter how many times you are asked about it . . . the story is going to

19  be consistent, it's going to stay the same. . . . [C.M.'s story] didn't. . . ."  (*Id*. at 330.)

20  Under these circumstances, petitioner has not overcome the presumption that his

21  counsel's strategy in cross-examining C.M. was reasonable, or demonstrated that his

22  counsel's errors resulted in prejudice as required by *Strickland*.  Accordingly, I recommend

that petitioner's claim be denied.

01          6.      Trial Counsel's Refusal to Allow Petitioner to Testify

02          Petitioner argues that his defense counsel refused to allow petitioner to testify in his

03  own defense.  (Dkt. 1 at 15.)  Petitioner contends that after the prosecution rested, he

04  expressed his desire to testify by writing a note to his trial counsel on a piece of scrap paper,

05  which he claims to have provided as an exhibit to his traverse.  (*See* Dkt. 19, Ex. 2.)

06  According to the exhibit, trial counsel asked petitioner, "What do you think a jury is going to

07  do with that."  (*Id*.)  After petitioner responded, "Hopefully my side will be of benefit," trial

08  counsel wrote, "You're an idiot."  (*Id*.)  Petitioner contends that he "was not informed of his

09  right on this issue and [was] unaware he could just speak out of turn in the courtroom,

10  incorrectly assuming that the appointed counsel had the final say."  (*Id*. at 15.)  Petitioner

11  acknowledges that the trial court denied his claim during the 2004 hearing on his motion for a

12  new trial, but contends that the trial court's conclusion was "baseless, [as] the court offered

13  nothing to demonstrate why the petitioner was not credible."  (*Id*.)

14          A criminal defendant has a personal right to testify on his own behalf.  *See Rock v.*

15  *Arkansas*, 483 U.S. 44, 51-52 (1987).  "Although the ultimate decision whether to testify rests

16  with the defendant, he is presumed to assent to his attorney's tactical decision not to have him

17  testify."  *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993) (citing *United States v.*

18  *Edwards*, 897 F.2d 445, 446-47 (9th Cir. 1990)).  A defendant who wants to reject his

19  attorney's advice and take the stand may do so by insisting on testifying, speaking to the

20  court, or discharging his lawyer.  *See id.*  Thus, a "waiver of this right may be inferred from

21  the defendant's conduct and is presumed from the defendant's failure to testify or notify the

22  court of his desire to do so."  *Id.  See also United States v. Pino-Noriega*, 189 F.3d 1089,

REPORT AND RECOMMENDATION - 28

01  1094-95 (9th Cir. 1999) (defendant waives his right to testify by waiting until after the jury

02  verdict to assert this right); *United States v. Nohara*, 3 F.3d 1239, 1244 (9th Cir. 1993)

03  (defendant's claim of ineffective assistance, where counsel allegedly waived the defendant's

04  right to testify and did not inform him of this right, was precluded by *Edwards*).

05        On direct appeal, the California Court of Appeal rejected petitioner's claim.

06  Specifically, the state court reasoned as follows:

07              Dickson also contends that his defense attorney at trial
        was ineffective because counsel failed to abide by his decision
08        to testify and failed to inform him of his right to testify
        notwithstanding counsel's advice not to do so.   At trial, the
09        defense rested without calling Dickson to testify.  The jury had
        been instructed not to draw any adverse inference from this
10        circumstance.  In his motion for new trial, he argued that his
        trial counsel's failure to abide by his decision to testify
11        amounted to ineffective assistance of counsel.  At the hearing
        on this motion, Dickson testified that his first attorney told him
12        that he would have to testify to counter some prosecution
        evidence.  The attorney who tried his case told him the same
13        thing, but later decided not to call Dickson to the stand.
        Dickson wanted to testify, but his attorney overruled him.
14        Dickson told the trial court at the hearing on the motion for new
        trial that trial counsel never told him that it was Dickson's
15        decision whether or not to testify.  The trial court denied the
        motion for new trial, after making remarks suggesting that it did
16        not find his testimony to be credible.
              A criminal defendant has a constitutional right to testify
17        in his or her defense.  (*Rock v. Arkansas* (1987) 483 U.S. 44,
        51-52.)  This is a personal right that trial counsel cannot waive.
18        (*Jones v. Barnes* (1983) 463 U.S. 745, 751; see *People v.
        Robles* (1970) 2 Cal.3d 205, 214-15.) When the record shows
19        no timely demand to testify from a criminal defendant, he or she
        may not wait until the jury renders its verdict and then seek
20        reversal of that verdict based on a claim that he or she was
        deprived of the opportunity to testify despite everything
21        conveying this desire to trial counsel.  (*People v. Alcala* (1992)
        4 Cal.4th 742, 805-806, cert. den. *sub nom. Alcala v. California*
22        (1993) 510 U.S. 877.)  He or she may raise this issue when
        challenging the effectiveness of trial counsel's assistance. . . .

REPORT AND RECOMMENDATION - 29

01         We presume that trial counsel performed his legal obligation to advise Dickson of his legal rights, including his
02         right to testify on his own behalf.  (See, e.g., *People v. Thomas*, (1974) 43 Cal.App.3d 862, 868; see also *People v. Bradford*,
03         *supra*, 14 Cal.4th at p. 1053.)  On appeal, Dickson contends that his trial counsel failed to do so and that this failure constituted
04         ineffective assistance of counsel.  He offers his testimony at the motion for new trial hearing as evidence rebutting this
05         presumption – i.e., evidence that he wanted to testify but was wrongfully precluded from doing so by trial counsel.  However,
06         the trial court did not believe this testimony.

07         Dickson argues that the trial court ought to have believed him. . . . He reasons that there was no evidence from
08         which the trial court could find that he was not a credible witness. This argument is nonpersuasive, being a fundamental
09         misunderstanding of the role of trial and appellate courts with regard to credibility issues.  It is the trial court's *function* to
10         determine the credibility of witnesses.  (See *People v. Leyba* (1981) 29 Cal.3d 591, 596.)  On appeal, the substantial evidence
11         rule bars us from reconsidering such credibility issues or substituting our judgment for the trial court's on them.  (See
12         *People v. Pace* (1994) 27 Cal.App.4th 795, 798.)  As the trial court did not believe Dickson's testimony offered at the hearing
13         on the motion for new trial, he has not established the factual underpinnings of this ineffective assistance of counsel claim.
14         Thus, the trial court properly denied the motion for new trial grounded on this claim of error.

15 (Dkt. 16, Ex. J at 18-20.)

16         On habeas review, state courts' factual findings are presumed correct unless the

17 petitioner rebuts the presumption of correctness by clear and convincing evidence.  *See* 28

18 U.S.C. § 2254(e)(1).  Here, petitioner has not provided any "clear and convincing" evidence

19 to rebut the state courts' finding as to the credibility of petitioner's testimony.  Apart from

20 petitioner's testimony at the post-trial hearing, petitioner has not provided any evidence to

21 support his assertion that his trial counsel failed to inform him of his right to testify in his own

22 defense.  (*See* Dkt. 16, Ex. C at 33.)  Furthermore, even if the handwritten note petitioner

REPORT AND RECOMMENDATION - 30

01  provided as an exhibit to his traverse is authentic, it does not prove that petitioner

02  unequivocally expressed his desire to testify to defense counsel.  In the note, petitioner only

03  stated, "Hopefully my side will be of benefit."  (Dkt. 19, Ex. 2.)  Petitioner could have

04  asserted his right to take the stand by insisting upon testifying, alerting the prosecution or the

05  court to his desire to testify, or discharging his counsel.  *See Joelson*, 7 F.3d at 177.  Instead,

06  petitioner silently acquiesced to his counsel's decision until approximately eight months after

07  the verdict, effectively waiving his right to testify.  *See Edwards*, 897 F.2d at 447.  As the trial

08  court observed, petitioner's assertion that he was denied his right to testify for the first time

09  "eight months after these events unfolded" is insufficient to entitle him to relief.  (*See* Dkt. 16,

10  Ex. C at 33-34.)  *See also Nohara*, 3 F.3d at 1244.  Finally, petitioner has failed to show a

11  reasonable probability that the outcome of the trial would have been different if petitioner had

12  testified.  *See Strickland*, 466 U.S. at 687.

13          Accordingly, the California Court of Appeal's denial of this claim was not contrary to

14  or an unreasonable application of clearly established federal law, or an unreasonable

15  determination of the facts.  I therefore recommend that the Court deny petitioner's claim.

16          7.      Trial Counsel's Failure to Present Expert Testimony Regarding Petitioner's
                    Genital Herpes

17

18          Petitioner contends that his trial counsel was ineffective because he failed to present

19  an expert witness to testify that it was "unlikely, if not impossible" for the charged offenses to

20  have occurred without the transmission of petitioner's genital herpes to C.M.  (*See* Dkt. 1 at

21  16-17.)  In support of his contention, petitioner provides a declaration from his private

22  investigator, who claimed to have "developed information regarding the defendant having

genital herpes, for which [C.M.] tested negative, despite her claim of at least two hundred sex

01  acts with the defendant.  I prepared information to prove how contagious genital herpes is to

02  present to the jury, indicating the unlikelihood of that many sex acts taking place without the

03  transmission of the virus to the infected party."  (*Id.*, Ex 1 at 1.)

04      On direct appeal, the California Court of Appeal rejected petitioner's claim.  The court

05  explained its conclusion as follows:

06          Dickson also challenges the effectiveness of his trial
        counsel on the ground that he failed to introduce evidence
07      relevant to his genital herpes infection.  The jury at trial heard
        evidence that Kelly and Dickson both suffered from genital
08      herpes.  Kelly described the physical appearance and effect of
        genital herpes.  She testified that this condition was extremely
09      contagious during an outbreak.  At trial, C.M. testified that she
        never saw any physical evidence suggesting herpes on
10      Dickson's penis.  She also testified that he always used a
        condom, although she told police that sometimes he did not do
11      so. On cross-examination, defense counsel brought out evidence
        that Geoffrey had C.M. tested for genital herpes but did not then
12      tell Kelly of the test results. In his motion for new trial, Dickson
        argued that he had received the ineffective assistance of counsel
13      based on defense counsel's failure to introduce evidence
        relevant to his genital herpes infection.  The trial court denied
14      that motion.
            On appeal, Dickson challenges trial counsel's failure to
15      introduce medical evidence relevant to his genital herpes
        infection.  He argues that the evidence shows that C.M. was not
16      infected by herpes although he was.  He reasons that if C.M.
        orally copulated him and engaged in sexual intercourse with
17      him as often as she testified that she did for as long a period of
        time as she did, she would surely have contracted genital herpes
18      from him. He contends that his trial counsel was incompetent
        for failing to investigate the significance of these facts and for
19      failing to bring out expert medical evidence that genital herpes
        is contagious even if a condom is used and even if an infected
20      person is not experiencing an outbreak.  The record on appeal
        shows that C.M. tested negative for various forms of herpes –
21      including type 2 herpes simplex virus – in November 2002.
        This evidence was not brought before the jury during the
22      January – February 2004 trial.

REPORT AND RECOMMENDATION - 32

We see several flaws in Dickson's argument.  First, he has not provided any evidence to support his claim that trial counsel did not investigate this issue.  He has not provided any declarations from trial counsel about whether or not he conducted such an investigation, nor have he or his appellate counsel filed any declarations stating that this information was sought but not obtained.  His claim that trial counsel must not have investigated this issue is speculation.  (See *People v. Cox*, *supra*, 53 Cal.3d at p. 662; *People v. Ledesma*, *supra*, 43 Cal.3d at p. 218.)

Second, Dickson's claim that competing evidence was necessary is not supported by the record. . . .  His argument implies that Kelly's testimony was that genital herpes is only contagious during an outbreak.  However, she did not testify to this.  As such, an attorney would not have been incompetent for failing to provide evidence to contradict evidence that Kelly did not offer. . . .

Third, Dickson offers no reliable medical evidence in support of his factual claims about the effect of genital herpes on sexual partners using condoms. . . .  Nor has he provided us with a declaration from a medical expert setting out the underlying medical facts.  As such, Dickson has not provided us with the evidence needed to prove this claim of ineffective assistance of counsel. . . .

Fourth, even if the evidence he now proffers were reliable to challenge C.M.'s credibility, sound tactical reasons might have persuaded trial counsel not to bring this evidence to the jury's attention . . . [A] reasonably competent defense attorney might choose not to emphasize to the jury that Dickson knowingly exposed C.M. to a sexually transmitted disease when he engaged in sexual acts with her.  Trial counsel may also have reasonably rejected use of this evidence in order to avoid being perceived of as attacking a young witness on [a] subject about which jurors might be sensitive.  Dickson has not overcome the strong presumption that the failure to offer this evidence might be considered a sound tactical decision.  (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 689; *In re Lucas*, *supra*, 33 Cal.4th at p. 722.)

Finally, even if we assume arguendo that trial counsel was incompetent for failing to bring out evidence of C.M.'s failure to contract genital herpes as tending to undermine her credibility about the number, type and frequency of sexual acts that Dickson committed against her . . . the appellant must still establish prejudice in order to prevail on an ineffective

01           assistance of counsel claim. . . .  In light of the implied
admissions that Dickson made during the October 17, 2002

02           taped telephone conversation with C.M. about their sexual
relationship, trial counsel's failure to elicit this evidence did not

03           render the jury's verdict unreliable. (See *Strickland v.
Washington*, *supra*, 466 U.S. at p. 686; *People v. Mayfield*,

04           *supra*, 14 Cal.4th at pp. 783-784.)

05  (Dkt. 16, Ex. J at 15-18.)

06        Based upon the record before this Court, the California Court of Appeal applied the

07  proper standard to petitioner's ineffective assistance of counsel claim, and reasonably

08  concluded that petitioner has not met his burden of proof.  Petitioner does not identify or

09  provide a declaration from any qualified expert who was available to testify about the

10  significance of herpes evidence at petitioner's trial, or show how such evidence would have

11  altered the outcome of his trial.  *See Berry*, 814 F.2d at 1409.  Without more, the declaration

12  of petitioner's private investigator is insufficient to prove that defense counsel's failure to

13  introduce expert testimony on this subject constituted deficient performance, or prejudiced the

14  outcome of the proceeding in light of the substantial evidence of petitioner's guilt.

15        Accordingly, the California Court of Appeal's denial of this claim was not contrary to

16  or an unreasonable application of clearly established federal law.  I therefore recommend that

17  the Court deny petitioner's claim.

18        8.    Trial Counsel's Failure to Allow Petitioner's Private Investigator to be Present
at Trial

19

20        Petitioner contends that his counsel was ineffective because he neglected "to submit a

    simple motion for the defense investigator [Eugene Borghello] to be present during the

21

    proceedings as was the prosecution's detective," or call Borghello as a witness at trial.  (Dkt.

22

    1 at 17.)  In his declaration, Borghello claims that he "arrived at the court for the

REPORT AND RECOMMENDATION - 34

01   commencement of the trial in question but was excluded from the proceedings as a witness in

02   the case when the defense counsel did not ask for an exception [to the trial court's exclusion

03   order] for the defense investigator to remain and assist him . . . I was [also] never called to

04   testify in this matter. . . ." (*Id.*, Ex. 1 at 2-3.)

05        Petitioner first presented this claim in his habeas petition to the California Supreme

06   Court, which was summarily denied. (*See* Dkt. 16, Ex. L at 15.)  Thus, this Court must

07   independently review the record to determine whether the state court's denial was an

08   unreasonable application of *Strickland.  See Delgado*, 223 F.3d at 982; *Strickland*, 466 U.S. at

09   691-92.

10        Petitioner has not demonstrated that his counsel's failure to ask the trial court to allow

11   Borghello to remain in the courtroom despite an exclusion order was objectively

12   unreasonable, because there are many plausible reasons why petitioner's counsel may have

13   neglected to make this request.  Defense counsel may have wished to preserve the option of

14   calling Borghello as a witness, which he would have forfeited if Borghello remained in the

15   courtroom and listened to the other witnesses' testimony.  *See* Cal. Evid. Code § 777(a) (the

16   trial court may enter an order excluding "any witness not at the time under examination so

17   that such witness cannot hear the testimony of other witnesses.").  Alternatively, counsel may

18   have reasonably concluded that Borghello's assistance or testimony was unnecessary or

19   undesirable, based upon the information Borghello had provided regarding his investigation.

20   (*See* Dkt. 1, Ex. 1.)  In any event, petitioner has not shown that defense counsel's decision to

21   try the case without Borghello's assistance or testimony was objectively unreasonable under

22   the circumstances.

01        In addition, assuming that Borghello was excluded from the courtroom while the

02   State's detective was allowed to remain, defense counsel's failure to raise a meritless

03   argument or take a futile action by objecting to the detective's presence did not constitute

04   ineffective assistance.  *See also Delgado v. Yates*, 622 F. Supp. 2d 854, 864 (N.D. Cal. 2008)

05   (denying petitioner's claim that his trial counsel was ineffective because he "failed to object

06   to the investigating officer's presence, in uniform, at the prosecution table during trial.").

07   California law generally allows an investigating officer to be present at trial when designated

08   by a government party such as the prosecutor, despite a trial court's exclusion order.  *See* Cal.

09   Evid. Code § 777(c) ("If a person other than a natural person is a party to the action, an officer

10   or employee designated by its attorney is entitled to be present."); *People v. Gonzalez*, 38

11   Cal.4th 932, 951 (2006) (presence of an investigating officer under Cal. Evid. Code § 777(c),

12   despite an order excluding all witnesses from the courtroom, did not violate defendant's

13   constitutional rights).

14        Finally, petitioner fails to specify what assistance or testimony Borghello could have

15   provided to change the outcome of the trial.  (*See* Dkt. 1 at 17-18.)  Based upon the statements

16   contained in Borghello's declaration, and in light of the substantial evidence presented against

17   petitioner at trial, the Court finds no reasonable probability that Borghello's assistance or

18   testimony could have changed the verdict.  *See Strickland*, 466 U.S. at 694.  I therefore

19   recommend that petitioner's claim be denied.

20        B.    *Petitioner's Confrontation, Due Process, and Ineffective Assistance Claims
                Regarding Improper Questioning of C.M. by Police*

21

22   Petitioner argues that he was denied his federal right to confrontation and due process

     by the admission of the videotaped pretrial interviews of C.M. because Detective Donaldson's

01  "suggestive questioning" rendered C.M.'s statements unreliable.  (*See* Dkt. 1 at 18.)  To

02  support his contention, petitioner solely relies upon a March 7, 2003, email in which C.M.

03  wrote, "Hi mom . . . well, yesterday at [D]etective [D]onaldson's office went pretty well.

04  [T]he only thing is that I totally forgot a bunch of stuff, but he helped refresh my memory so

05  that's good. . . ." (*Id*., Ex. 7.)  Petitioner asserts that "[i]f the accuser could not remember her

06  own story, the detective acted improperly leading the accuser in her recorded statements,"

07  which he claims prejudiced the proceeding when the tapes were later played for the jury.  (*Id*.

08  at 19.)  He also alleges that his counsel was ineffective for failing to introduce C.M.'s email

09  into evidence to impeach C.M.'s credibility at trial.  (*Id*. at 20.)

10      Petitioner first presented this claim in his habeas petition to the California Supreme

11  Court, which was summarily denied.  (*See* Dkt. 16, Ex. L at 16-17.)  Thus, this Court must

12  independently review the record to determine whether the state court's denial was an

13  unreasonable application of clearly established federal law, or based upon an unreasonable

14  determination of the facts.  *See Delgado*, 223 F.3d at 982.

15      The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

16  prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

17  him. . . ."  U.S. Const. amend. VI.  In *Crawford v. Washington*, the U.S. Supreme Court

18  asserted that "when [a] declarant appears for cross-examination at trial, the Confrontation

19  Clause places no constraints at all on the use of his prior testimonial statements," which are

20  statements made "for the purpose of establishing or proving some fact" or past event.  541

21  U.S. 36, 59 n.9 (2004) (citing *California v. Green*, 399 U.S. 149, 162 (1970)).  As long as the

22  declarant is available at trial, it is "irrelevant that the reliability of some out-of-court

01  statements cannot be replicated, even if the declarant testifies to the same matters in court."

02  *Crawford*, 541 U.S. at 59 n.9.  Thus, the Confrontation Clause "does not bar admission of a

03  statement so long as the declarant is present at trial to defend or explain it." *Id.*

04       Even assuming *arguendo* that some of C.M.'s testimonial statements during her

05  pretrial interviews were the product of Detective Donaldson's leading questions, the

06  admission of those statements did not violate petitioner's right to confrontation because C.M.

07  testified at trial.  As discussed above, petitioner's counsel cross-examined C.M. regarding

08  several of her inconsistent statements at trial, and discussed their significance during his

09  closing argument.  Accordingly, petitioner's right to confront C.M. was not violated by the

10  trial court's admission of C.M.'s videotaped pretrial interviews.  *See Green*, 399 U.S. at 157-

11  64; *Delaware v. Fensterer*, 474 U.S. 15, 21-22 (1985) ("the Confrontation Clause is generally

12  satisfied when the defense is given a full and fair opportunity to probe and expose . . .

13  infirmities through cross-examination, thereby calling to the attention of the factfinder the

14  reasons for giving scant weight to the witness' testimony.").

15       To the extent petitioner is arguing that the admission of the videotapes of C.M.'s

16  interviews also violated his federal due process rights, his contention fails.  C.M.'s email to

17  her mother only suggested that Detective Donaldson helped "refresh" C.M.'s recollection of

18  certain details, which the jury already learned by watching the videotape of C.M.'s March 6,

19  2003, interview.  (*See* Dkt. 16, Ex. 7; *id.*, 1 RT at 158 and 280; *id*, Ex. D at 4, 5, 9, 18, 21, and

20  45.)  Petitioner has failed to identify any part of C.M.'s interviews in which the detective

21  engaged in improper questioning by providing details not previously supplied by C.M.  (*See*

22  Dkt. 16, Exs. D-F.)  In any event, even if some of the detective's questions during the pretrial

01 interviews were improper, in light of the fact that C.M. was subject to cross-examination

02 regarding her statements during these interviews at trial, any error did not have a "substantial

03 and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*,

04 507 U.S. 619, 637 (1993.) *See Fry v. Pliler*, 551 U.S. 112, (2007) ("We hold that in § 2254

05 proceedings a court must assess the prejudicial impact of constitutional error in a state-court

06 criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*. . . .").

07        Finally, because C.M.'s email did not contain any information the jury did not learn by

08 watching C.M.'s videotaped interviews, petitioner has not shown that it was objectively

09 unreasonable for his counsel to decline to use the email to impeach C.M., or a reasonable

10 probability that if the email had been used at trial, the jury would have reached a different

11 result. *See also Strickland*, 466 U.S. at 694.  Accordingly, the California Supreme Court's

12 rejection of petitioner's claim was not contrary to or an unreasonable application of clearly

13 established U.S. Supreme Court law.

14        C.     *Petitioner's Prosecutorial Misconduct Claims*

15        1.     Prosecutorial Misconduct Claims Raised Below on Collateral Review

16        Petitioner contends that his federal right to due process was violated by prosecutorial

17 misconduct, because "the prosecution made untrue, inflammatory remarks" throughout

18 closing argument.  (Dkt. 1 at 21.)  Specifically, petitioner alleges that the prosecutor

19 mischaracterized petitioner's "normal parent involvement" in C.M.'s day-to-day activities as

20 evidence that petitioner was suspiciously "controlling" of C.M.  (*Id*.)  In addition, petitioner

21 argues that the prosecutor mischaracterized C.M. as a "good student" in order to argue that

22 she had no reason to "be in trouble" or make false accusations against petitioner, when C.M.'s

01    progress report and an email from her science teacher indicated otherwise.  (*Id*. at 22-23.)

02    Finally, petitioner claims the prosecutor's remark, "It's the big Homecoming at high school

03    and she's placed in a shelter," falsely suggested that C.M. missed the homecoming dance at

04    her school as a result of coming forward with her accusations against petitioner.  (*Id*. at 23.)

05           Petitioner first presented these arguments in his habeas petition to the California

06    Supreme Court, which was summarily denied.  (*See* Dkt. 16, Ex. L at 18-21.)  This Court

07    must independently review the record to determine whether the state court's denial was an

08    unreasonable application of clearly established federal law, or based upon an unreasonable

09    determination of the facts.  *See Delgado*, 223 F.3d at 982.

10           To prevail on a claim of prosecutorial misconduct in a habeas action, a petitioner must

11    show that the alleged misconduct "so infected the trial with unfairness as to make the

12    resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168, 181

13    (1986).  *See also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v. DeChristoforo*, 416

14    U.S. 637, 643 (1974).  Not every improper or unfair remark made by a prosecutor will amount

15    to a federal constitutional deprivation.  *See Caldwell v. Mississippi*, 472 U.S. 320, 338 (1985).

16    Furthermore, the Court must consider the challenged statement in the context of the entire

17    trial, rather than in isolation.  *See Greer*, 483 U.S. at 765-66; *Donnelly*, 417 U.S. at 643.

18           During closing argument, a prosecutor may argue reasonable inferences based on the

19    evidence.  *See United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).  "Counsel are

20    given latitude in the presentation of their closing arguments, and courts must allow the

21    prosecution to strike hard blows based on the evidence presented and all reasonable inferences

22    therefrom."  *Ceja v. Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996).  A prosecutor may not,

01  however, mistake the evidence or make a bad faith argument based on facts that the

02  prosecutor knows are untrue.  *Darden*, 477 U.S. at 181-82; *United States v. Kojayan,* 8 F.3d

03  1315, 1319 (9th Cir. 1993).  Nonetheless, an attorney's misstatement of the facts during

04  closing argument, by itself, does not necessarily warrant habeas relief.  *See Kojayan*, 8 F.3d at

05  1318.  *See also United States. v. Young*, 470 U.S. 1, 11 (1985) ("Inappropriate prosecutorial

06  comments, standing alone, would not justify a reviewing court to reverse a criminal

07  conviction obtained in an otherwise fair proceeding.").  As a result, when determining the

08  prejudicial effect of a prosecutor's factual misstatement during closing argument, the Court

09  "must consider whether the misstatement likely affected the verdict."  *Kojayan*, 8 F.3d at

10  1318; *Young*, 470 U.S. at 12.

11      Here, petitioner has failed to show that any of the prosecutor's statements during

12  closing argument unfairly affected the jury's verdict.  Specifically, the prosecutor's assertions

13  regarding petitioner's "controlling" behavior with C.M. was a permissible argument "based

14  on the evidence presented and all reasonable inferences therefrom."  *Stewart*, 97 F.3d at 1253-

15  54.  Similarly, as discussed *supra*, the prosecutor's characterization of C.M. as a "good

16  student" was a reasonable interpretation of the evidence presented at trial.  (*See* Dkt. 16, 1 RT

17  at 102-03, 146; *id*., 2 RT at 274, 341.)

18      Based upon the record before this Court, it is unclear whether the prosecutor misstated

19  the facts when she remarked, "It's the big homecoming at high school and [C.M. is] placed in

20  a shelter."  (*Id*., 2 RT at 312.)  The prosecutor's statement was made in the context of arguing

21  that C.M. had nothing to gain, beyond ceasing the molestation by petitioner, when she

22  reported the offenses to law enforcement.  (*See id*. at 310-13.)  At trial, C.M. testified that she

01   had been allowed to attend the homecoming dance at her high school.  (*See id.*, 1 RT at 145;

02   *id.*, 2 RT at 312.)  Thus, even if the prosecutor was mistaken about the precise timing of

03   C.M.'s homecoming dance and the period when C.M. entered a shelter, in light of C.M.'s

04   testimony and the substantial evidence of petitioner's guilt, it is unlikely the prosecutor's

05   statement affected the verdict.  *See Kojayan*, 8 F.3d at 1318; *Young*, 470 U.S. at 12.   There is

06   also no evidence that the prosecutor's argument, even if inaccurate or misleading, was made

07   in bad faith.  *See Darden*, 477 U.S. at 181-82.

08         Accordingly, the California Supreme Court's rejection of these prosecutorial

09   misconduct claims constituted a reasonable application of clearly established federal law.

10   Petitioner has failed to show that misconduct by the prosecutor "so infected the trial with

11   unfairness as to make the resulting conviction a denial of due process."  *See Darden*, 477 U.S.

12   at 181.  I therefore recommend that petitioner's claims be denied.

13         2.      Prosecutorial Misconduct Claims Raised Below on Direct Review

14         Petitioner also contends that the prosecutor committed misconduct by telling the jury

15   during closing argument that C.M. "never once wavered, she never once changed her story.

16   She was consistent when she came to law enforcement."  (Dkt. 1 at 23; *see also* Dkt. 16, 2 RT

17   at 313.)  Petitioner argues that the prosecutor's statement was false, because C.M. had

18   recanted her statements to law enforcement by letter shortly after coming forward with her

19   allegations, and C.M. made numerous inconsistent statements during her interviews with the

20   detectives.  (*See* Dkt. 1 at 23-24.)  Respondent contends that petitioner's claim is procedurally

21   barred from review by this Court because he failed to lodge a contemporaneous objection to

22   the prosecutor's misconduct in the trial court and therefore procedurally defaulted on this

01  claim in the state courts.  (*See* Dkt. 16 at 33-34.)

02       The U.S. Supreme Court has held that a federal habeas petitioner's failure to raise a

03  timely objection to misconduct in the trial court, in compliance with a state's

04  "contemporaneous objection" rule, is an independent and adequate state ground for a

05  petitioner to default his federal claims in state court.  *Wainright v. Sykes*, 433 U.S. 72, 87

06  (1977).  *See also Melendez v. Warden*, 288 F.3d 1120, 1125 (9th Cir. 2002); *Garrison v.*

07  *McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981).  Federal habeas review of procedurally

08  defaulted claims is barred unless the prisoner can demonstrate (1) "cause" for the default and

09  "actual prejudice" as a result of the alleged violation of federal law, or (2) that the federal

10  court's failure to consider the claims will result in a fundamental miscarriage of justice.  *See*

11  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

12       Petitioner first presented his prosecutorial misconduct claim regarding the prosecutor's

13  statement that C.M.'s story "never once wavered" on direct appeal to the California Court of

14  Appeal.  In holding that petitioner waived his right to raise his claim by failing to object to the

15  prosecutor's misconduct at trial in compliance with California's "contemporaneous objection

16  rule," the state court reasoned as follows:

17           The California Supreme Court has expressly required a
             trial court objection as a prerequisite to an appellant raising a
18           prosecutorial misconduct claim of error unless an
             admonishment could not have cured the asserted harm, even in
19           the fact of a constitutional claim on appeal. . . .

                 In this matter, Dickson specifically challenges the
20           prosecution for arguing that C.M. did not waver or change her
             story, but presented a consistent report to law enforcement
21           officials.  He asserts that this argument is untrue, alluding to
             numerous inconsistencies in C.M.'s reports to police . . . [and]
22           contends that [the prosecutor's argument] constituted
             misconduct rendering his trial unfair.

REPORT AND RECOMMENDATION - 43

01          [The claim] of prosecutorial misconduct in this matter
02     [does] not satisfy us that an exercise of that discretion – if we
       have it at all – would be warranted in this matter.  Instead, we
       are satisfied that if those claimed incidents of prosecutorial
03     misconduct had been assigned as such in the trial court on the
       grounds asserted on appeal and if the trial court had agreed that
04     the prosecutor committed misconduct, an admonition would
       have cured any error.  Thus, Dickson waived this issue for our
05     review on appeal.  (*See*, *e.g.*, *People v. Clair*, *supra*, 2 Cal.4th at
       p. 664.)

06

(Dkt. 16, Ex. J at 21-22.)

07
        Thus, petitioner waived his prosecutorial misconduct claim by failing to object to the
08
prosecutor's statements at trial, and this Court is barred from reviewing petitioner's claim on
09
federal habeas review unless petitioner can demonstrate (1) both cause and prejudice, or (2) a
10
fundamental miscarriage of justice if this Court declines to review his claims.  *See Thompson*,
11
501 U.S. at 730; *Sykes*, 433 U.S. at 87.  Petitioner does not contend that federal review of his
12
claims is necessary to prevent a fundamental miscarriage of justice.  *See id.*  In addition,
13
petitioner has failed to demonstrate "cause" or "actual prejudice" sufficient to excuse his
14
procedural default in state court.
15
        In *Murray v. Carrier*, the U.S. Supreme Court considered the circumstances under
16
which attorney error may constitute "cause" for procedural default in state court, and held that
17
"[s]o long as a defendant is represented by counsel whose performance is not constitutionally
18
ineffective under the standard established in *Strickland v. Washington* . . . we discern no
19
inequity in requiring him to bear the risk of attorney error that results in a procedural default."
20
477 U.S. 478, 487 (1986).  *See also Thompson*, 501 U.S. at 752-54.  Although petitioner
21
contends that ineffective assistance by his trial counsel was the "cause" of his default, because
22
his trial counsel "failed to object" to the prosecutor's statements, petitioner has failed to

01 satisfy the requirements of *Strickland*.  (*See* Dkt. 1 at 21-24.)  As the California Court of

02 Appeal reasoned,

> [E]ven if we assume that the prosecutor's arguments were improper – they did not render his trial unfair.  As he cannot establish prejudice, Dickson could not meet the standard for proving a claim of ineffective assistance of counsel for failing to object to the prosecutor's argument.

06 (Dkt. 16, Ex. J at 22 n.3.)

07      Accordingly, petitioner has failed to show that ineffective assistance by his trial

08 counsel was the "cause" of his procedural default, or that the error resulted in "actual

09 prejudice."  *See Thompson*, 501 U.S. at 730; *Sykes*, 433 U.S. at 87.  Petitioner is therefore

10 barred from raising this prosecutorial misconduct claim in his federal habeas petition.  *Id.*

11      D.      *Petitioner's Due Process Claim Regarding Jury Misconduct*

12      Petitioner argues that his right to due process was violated by jury misconduct, which

13 involved the "harassing and intimidation of a single jury member who expressed opposing

14 viewpoints than others. . . ." (Dkt. 1 at 24.)  Specifically, petitioner asserts that juror

15 Oluwasola Ifasade wanted to vote "not guilty," but was subjected to verbal harassment by the

16 other jurors during deliberations until she changed her vote.  (*See id.* at 24-25.)  Petitioner

17 asserts that Ifasade was also "physically threatened by another juror putting his hands in her

18 face and yelling at her in an attempt to persuade her to change her vote, which ultimately she

19 did against her better judgment." (*Id.* at 25.)  In support of his contention, petitioner provides

20 declarations from Ifasade, as well as a private investigator who interviewed Ifasade and

21 several other jurors in August 2006, two years after petitioner's conviction.  (*See id.*, Exs. 8

22 and 9.)

REPORT AND RECOMMENDATION - 45

01          Petitioner first presented his due process claim in his habeas petition to the California

02   Supreme Court, which was summarily denied.  (*See* Dkt. 16, Ex. L at 22.)  Thus, this Court

03   must independently review the record.  *See Delgado*, 223 F.3d at 982.  As a threshold matter,

04   this Court must determine whether, on federal habeas review, it can consider the juror's

05   declarations regarding the alleged juror misconduct to impeach the verdict.

06          The U.S. Supreme Court has held that affidavits, declarations, and statements by

07   jurors may not be used to impeach a verdict once the jury has been discharged unless

08   extraneous influence has invaded the jury room.  *See Tanner v. United States*, 483 U.S. 107,

09   117 (1987).  *See also McDonald v. Pless*, 238 U.S. 264, 269 (1915) (as general rule, jurors

10   may not impeach their own verdict); *Estrada v. Scribner*, 512 F.3d 1227, 1237 (9th Cir. 2008)

11   (a juror's declaration that he felt pressured to vote guilty constituted inadmissible evidence of

12   the jury's subjective mental process); *Traver v. Meshriy*, 627 F.2d 934, 941 (9th Cir. 1980)

13   (the common law rule is that "once a verdict has been delivered and accepted in open court,

14   and the jury is polled and discharged, jurors may not claim that their assent was mistaken or

15   unwilling.").  In addition, Federal Rule of Evidence 606(b) prohibits jurors from testifying as

16   to matters or statements occurring during the course of jury deliberations, as well as the effect

17   of such matters or statements on any juror's mental processes or emotions in reaching a

18   verdict.  *See* Fed. R. Evid. 606(b).  This provision also provides that "a juror's affidavit or

19   evidence of any statement by the juror may not be received on a matter about which the juror

20   would be precluded from testifying."  *Id*.

21          Accordingly, absent an allegation by petitioner that extraneous prejudicial information

22   invaded the jury room, this Court may not review the jury's deliberative process by

01  considering statements made by Ifasade or any of the other jurors to impeach the verdict. *See*

02  *Estrada*, 512 F.3d at 1237; *United States v. Davis*, 960 F.2d 820, 828 (9th Cir. 1992). The

03  declarations provided by petitioner concern matters or statements which occurred during the

04  course of jury deliberations, as well as the effect of such matters or statements on the jurors'

05  mental processes or emotions in reaching a verdict. (*See* Dkt. 1, Exs. 8 and 9.) This Court

06  may not consider the jurors' statements, years after petitioner's conviction, to impeach the

07  verdict.

08       Accordingly, the California Supreme Court's rejection of petitioner's due process

09  claim was not contrary to, or an unreasonable application of, clearly established federal law. I

10  therefore recommend that petitioner's contention be denied.

11       E.    *Petitioner's Cumulative Prejudice Claim*

12       Petitioner's final claim is that he was denied due process by the cumulative prejudice

13  accruing from multiple errors by the trial court, which he argues entitle him to habeas relief.

14  (*See* Dkt. 1 at 25.) Because petitioner presented this claim in his habeas petition to the

15  California Supreme Court, which was summarily denied, this Court must independently

16  review the record. (*See* Dkt. 16, Ex. L at 23.) *See also Delgado*, 223 F.3d at 982.

17       For the reasons discussed above, the Court has found no constitutional error based

18  upon the claims in petitioner's federal habeas petition, let alone multiple errors. "Because

19  there is no single constitutional error in this case, there is nothing to accumulate to a level of a

20  constitutional violation." *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Even

21  assuming there were errors, the combined effect did not result in cumulative prejudice. *See*

22  *Willafuerte v. Stewart*, 111 F.3d 616, 632 (9th Cir. 1997). Accordingly, the state courts'

01   denial of petitioner's claim was not contrary to or an unreasonable application of clearly

02   established federal law, or based upon an unreasonable determination of the facts.

03         VI.     CERTIFICATE OF APPEALABILITY

04         The federal rules governing habeas cases brought by state prisoners have recently been

05   amended to require a district court that denies a habeas petition to grant or deny a certificate

06   of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C.

07   § 2254 (effective December 1, 2009).

08         A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

09   dismissal of his federal habeas petition only after obtaining a certificate of appealability from

10   a district or circuit judge.  A judge shall grant a certificate of appealability only where a

11   petitioner has made "a substantial showing of the denial of a constitutional right."  *See* 28

12   U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard.  *See id*.

13   § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the

14   showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that

15   reasonable jurists would find the district court's assessment of the constitutional claims

16   debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 474 (2000).

17         For the reasons set out in the discussion of the merits, above, jurists of reason would

18   not find the result debatable.  Accordingly, I recommend that the Court decline to issue a

19   certificate of appealability.  Petitioner is advised that, if this Court denies a certificate of

20   appealability, he may not appeal that denial in this Court.  Rather, he may seek a certificate

21   from the Ninth Circuit Court of Appeals under Rule 22 of the Federal Rules of Appellate

22   Procedure.

01        VII.    CONCLUSION

02            For all of these reasons, I recommend the Court find that the state courts' decisions

03    denying petitioner's claims were not contrary to, or an unreasonable application of, clearly

04    established federal law, or based on an unreasonable determination of facts.  I further

05    recommend that the Court decline to issue a certificate of appealability and enter an Order

06    approving and adopting this Report and Recommendation, denying the petition (Dkt. 1), and

07    directing that judgment be entered dismissing this action with prejudice.

08            This Report and Recommendation is submitted to the United States District Judge

09    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

10    days of being served with this Report and Recommendation, any party may file written

11    objections with this Court and serve a copy on all parties.  Such a document should be

12    captioned "Objections to Magistrate Judge's Report and Recommendation."  Either party may

13    then respond to the other party's objections within fourteen (14) days of being served a copy

14    of such written objections.  Failure to file objections within the specified time may waive the

15    right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A

16    proposed order accompanies this Report and Recommendation.

17            DATED this 13th day of May, 2010.

18

19

20                                                    _____

21                                                    JOHN L. WEINBERG
                                                      United States Magistrate Judge

22

REPORT AND RECOMMENDATION - 49